[No. A104324. First Dist., Div. One. Feb. 4, 2005.]

JANET ROBBINS et al., Plaintiffs and Respondents, v.
JOSEPH ALIBRANDI et al., Defendants and Respondents;
ANGELO PERONE et al., Objectors and Appellants.

## COUNSEL

Charles D. Chalmers for Objectors and Appellants.

Lerach Coughlin Stoia & Robbins, Frank J. Janecek, Jr., Kevin K. Green, Patrick J. Coughlin; Bushnell, Caplan & Fielding, Alan M. Caplan; The Rossbacher Firm and Henry H. Rossbacher for Plaintiffs and Respondents.

Heller Ehrman White & McAuliffe, Robert A. Rosenfeld, Laurence A. Weiss and Nicole M. Ryan for Defendant and Respondent Bank of America.

Morrison & Foerster, Melvin R. Goldman, Judson E. Lobdell, Evan L. Land and Jack Londen for Defendants and Respondents Joseph Alibrandi et al.

## OPINION

**STEIN, J.**—Plaintiffs, stockholders of BankAmerica Corporation (BankAmerica), brought a shareholder derivative suit on behalf of BankAmerica, against a number of former members of the board of directors of BankAmerica and Security Pacific Corp. (Security Pacific), alleging, generally, that defendants had mismanaged both companies, with the result that the companies ultimately paid $187.5 million to settle claims by the State of California and the City of San Francisco. Plaintiffs and defendants agreed to settle this suit, and, by separate agreement, further agreed that the companies' successor, BankAmerica Corporation (BofA) would pay plaintiffs $5 million for attorney fees and expenses incurred in litigating the action.

A number of stockholders, including Angelo and Mary Perone (objectors) objected to the settlement, to the agreement to pay attorney fees, or both. BofA, however, favored both agreements, and urged the trial court to approve them. The trial court, agreeing with BofA, approved the settlement and the

negotiated fee award. Objectors appeal. They do not complain about the substantive terms of the settlement. They contend that the attorney fees are too high, asserting that they do not accurately reflect the value of the services performed by plaintiffs' attorneys.

■ This appeal concerns the obligation of a trial court to review an agreement to pay attorney fees negotiated as part of the settlement of a shareholder derivative action. We hold that the trial court has such a duty, but that, unlike the obligation of a court when fashioning a fee award, the court's task in a negotiated settlement of fees is to determine if the negotiated fee is fair. That task requires the court to review the settlement as a whole, including the fee award, to ensure that it was fairly and honestly negotiated, is not collusive and adequately protects the interests of the corporation and of the shareholders. The court is entitled to recognize that the corporation may have a legitimate business interest in settling a marginal case, including paying the plaintiffs' attorney fees, as a means of avoiding the costs of litigation. Nonetheless, the plaintiffs' attorneys owe an ethical and fiduciary duty to their clients—the shareholders, and through them to the corporation itself—to limit fees to an amount that represents the value of the work done. Therefore, although a negotiated fee may represent a reasoned business decision to settle, a negotiated fee that exceeds a fair and reasonable fee for the attorneys' contribution may not be approved. We reverse and remand for such a determination.

BACKGROUND

In 1995, Patrick Stull and others, on behalf of the State of California and various political subdivisions (the *Stull* plaintiffs), filed a qui tam action against BankAmerica. (*State ex rel. Stull v. Bank of America N.T. & S.A.* (Super. Ct. S.F. City and County, 1995, No. 968484) (*Stull*).) The *Stull* plaintiffs claimed, in part, that BankAmerica had failed to escheat to the State of California, or to return to California municipal issuers, over $1 billion in unclaimed property associated with bonds for which BankAmerica had served as paying agent. In essence, the *Stull* plaintiffs alleged that BankAmerica's records had become inaccurate and unreliable through the use of incorrect transaction codes by clerks in the corporate trust departments, bond accounting system conversions and account reconciliations. As a result, numerous individual bonds and coupons remained unpresented by bondholders, and therefore unpaid by BankAmerica. The State of Alaska and Energy Northwest (formerly known as Washington Public Power Supply System) made similar claims against BankAmerica.

BankAmerica sold its corporate trust business in 1995.

On July 10, 1997, while the *Stull* action was pending, plaintiffs brought this shareholder derivative action against former members of the board of directors of BankAmerica and Security Pacific (which had been acquired by BankAmerica in 1992). BankAmerica is a nominal defendant in these proceedings, but, because of the nature of derivative actions, is in effect the real plaintiff in interest. The complaint restated the allegations made in the *Stull* case, claiming that the wrongs leading to that action resulted from the failure of the defendant directors properly to manage and supervise the billing practices of the bank and properly to oversee, manage and control BankAmerica's corporate trust and securities services. Plaintiffs sought declaratory relief, damages, punitive damages and injunctive relief on behalf of the corporation, and costs and disbursements on behalf of themselves, including reasonable attorney fees and expert fees.

Litigation in this case was stayed while *Stull* was pending. In the meantime, in October 1998, BankAmerica merged into NationsBank Corporation, which then changed its name to Bank of America Corporation (BofA). The *Stull* action settled the following month for $187.5 million. In April 1999, plaintiffs amended their complaint to add allegations that defendants' lack of oversight and inattentiveness allowed the wrongs complained of in *Stull* to go uncorrected, exposing the corporation to massive liability.

The court sustained demurrers to the first amended complaint, and later, to a second amended complaint, ruling in part that plaintiffs had failed to allege with "sufficient particularity" that it would have been futile to demand that the board of directors take action to remedy the problems identified in the complaint.[1] The court noted that board passivity in the face of employee misconduct generally is insufficient to give rise to a claim of demand futility, but granted leave to amend, directing plaintiffs to allege specific facts demonstrating that a majority of the board of directors actively had participated in the wrongdoing.

In July 2000, after reviewing documents obtained from the *Stull* litigation, plaintiffs filed a third amended complaint, containing some 90 pages of factual allegations. In December 2000, the trial court overruled demurrers to the third amended complaint. The court found that plaintiffs had not alleged particularized facts creating a reasonable doubt that the directors were disinterested or independent, but had alleged facts sufficient to create a reasonable doubt that the directors had exercised proper business judgment in

---

[1] A plaintiff shareholder seeking to maintain a shareholder derivative action must allege with sufficient particularity either that the plaintiff made a demand on the board of directors to take action, which the board wrongfully refused, or that such a demand would have been futile. (Corp. Code, § 800, subd. (b)(2); *Shields v. Singleton* (1993) 15 Cal.App.4th 1611, 1616–1617 [19 Cal.Rptr.2d 459].)

approving the alleged transactions. The court also ruled that plaintiffs were not required to make a demand on the new, postacquisition board, as demand futility is determined at the time the complaint is filed. The matter was stayed until February 16, 2001, while defendants sought relief from the court's ruling by means of petition for writ of mandate.

Defendants' petition was denied. Defendants then responded to plaintiffs' previous demands for discovery, and plaintiffs sought additional discovery. These matters led to several meet-and-confer discussions and, ultimately, to a number of motions to compel discovery.

In October 2001, the parties informed the court that they had reached a settlement. The parties stipulated that although BofA did not then have a corporate trust paying agency business, since the filing of this action, it had undertaken to identify best practices with respect to unclaimed property and escheat compliance within its various domestic business units, and to develop a compliance program applicable to all major domestic business units responsible for handling escheatable property types (the Compliance Program). Under the terms of the settlement, for a period of two years, BofA would cause annual written reports to be generated reporting the status of the Compliance Program and summarizing any negative findings related to the program or the escheatment of identified unclaimed or abandoned property. These reports were to be delivered to the board's audit committee. In addition, if BofA reentered the corporate trust paying agency business within two years, it would implement the Compliance Program within the corporate trust unit and, during the two-year period, would provide the audit committee with annual written reports on the status of the program within that unit. In addition, the defendant directors were to be released from all claims arising from the derivative action, the *Stull* action, the Alaska matter, the Energy Northwest matter, or from the settlement of those actions and matters.

The parties further agreed that plaintiffs would receive $5 million for attorney fees and expenses, an amount that would be paid by the defendant directors, through their insurer. Finally, the parties agreed that the substantive terms of the settlement agreement would stand even if the court did not approve the award of attorney fees or if that award were reversed or modified on appeal.

As noted, although BofA was a nominal defendant, the action actually was brought by stockholders on behalf of the corporation, against members of the former BankAmerica's board of directors. By the time of the settlement, as a result of the merger between BankAmerica and NationsBank, only three out of 18 of BofA's directors were defendants in the action. The three defendant directors did not participate in the board's consideration of the settlement. A majority of the remaining 15 directors voted to approve the settlement.

The trial court preliminarily approved the settlement. Notice of the settlement was sent to shareholders, informing them of the settlement's terms, their right to file written objections with the superior court, and their right to appear at the settlement hearing. Thirty out of 780,000 shareholders filed written objections, protesting either the substantive terms of the settlement, the award of attorney fees, or both. Several objectors, including Angelo and Mary Perone, appeared at the settlement hearing.

BofA, however, favored the settlement and, through the 15 nondefendant directors, urged the court to approve it. BofA's position was that there was no reasonable likelihood that the litigation would lead to a monetary recovery sufficient to justify the continued prosecution of the suit. In addition, continued litigation would be extremely costly, protracted and disruptive of the corporation. BofA would be required to pay its own attorney fees and costs, and also to pay the fees and costs of the individual defendants, although BofA would be entitled to seek reimbursement from those defendants if it ultimately was determined that they had not acted in good faith. BofA reported that it had determined it was in the best interests of the corporation and its stockholders to compromise and settle the litigation on the proposed terms.

The court, after conducting hearings over several days, and after reading and considering arguments made by all parties and objectors, approved the settlement and, by separate order, approved the agreement to pay $5 million for attorney fees and expenses. The court analyzed the situation as if it were awarding fees under the "substantial benefit doctrine." It fixed a lodestar. It then applied a multiplier of 3.0 to the lodestar for the period from inception of litigation to the execution of the *Stull* settlement, a multiplier of 2.75 to the period from the *Stull* settlement to the date the stay of further litigation expired, a multiplier of 2.5 to the period from that date up to the date the settlement was submitted at the final approval hearing and no multiplier for work done after that date. The court found that if it had been called upon to award fees under the "substantial benefit doctrine," it would have awarded $5,072,772.29. Based on this finding, the court concluded that the $5 million to which the parties agreed was a fair and reasonable amount for fees and costs.

The court then entered judgment dismissing the action with prejudice, and awarded $5 million to plaintiffs for costs and attorney fees.

Objectors appeal.

## Discussion

Objectors do not attack the substantive terms of the settlement. Their complaint is with the agreement to pay attorney fees. They contend that fees

were unwarranted under the "substantial benefit doctrine." They also contend that even if some amount of fees was justified, the court erred or abused its discretion in its use of multipliers to inflate that amount.

■ Objectors are correct that where fees are sought in a shareholder derivative suit under the "substantial benefit doctrine," the court considers whether the litigation has conferred a substantial benefit on the corporation, i.e., a benefit that is actual and concrete and not conceptual or doctrinal. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 946–948 [154 Cal.Rptr. 503, 593 P.2d 200]; *Braude v. Automobile Club of Southern Cal.* (1986) 178 Cal.App.3d 994, 1006–1007 [223 Cal.Rptr. 914]; *Fletcher v. A.J. Industries, Inc.* (1968) 266 Cal.App.2d 313, 320, 324 [72 Cal.Rptr. 146].) The benefit need not be pecuniary (*Fletcher v. A.J. Industries, Inc., supra,* at p. 324), but it must be " 'something more than technical in its consequence and . . . one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect[s] the enjoyment or protection of an essential right to the stockholder's interest.' " (*Mills v. Electric Auto-Lite* (1970) 396 U.S. 375, 396 [24 L.Ed.2d 593, 90 S.Ct. 616], quoting *Bosch v. Meeker Cooperative Light and Power Ass'n* (1960) 257 Minn. 362 [101 N.W.2d 423, 427].) The court assessing fees begins with a lodestar figure based on the careful compilation of the time spent and reasonable hourly compensation of each attorney involved in the presentation of the case. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131–1132 [104 Cal.Rptr.2d 377, 17 P.3d 735]; *Serrano v. Priest* (1977) 20 Cal.3d 25, 48 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*).) The court then has the power and the duty to enhance, or to reduce, the lodestar through the use of multipliers, by taking into consideration factors such as the novelty and complexity of the issues, the skill and expertise of counsel, the extent that the litigation precluded other employment and the contingent nature (or risk) of nonrecovery. (*Ketchum v. Moses,* at p. 1132; *Serrano III,* at p. 49.)

■ Objectors further are correct that costs saved in avoiding litigation are not a benefit conferred on a party that can justify a fee award under the "substantial benefit doctrine." That doctrine recognizes that fees may be awarded only when the litigation results in a substantial benefit to the corporation; however, avoidance of further costs is not a benefit resulting from litigation, but rather a benefit resulting from *ceasing* litigation.

■ Objectors' arguments would be directly relevant if the parties had asked the court to fashion a fee award under the "substantial benefit doctrine." But they did not. They asked the court to approve a negotiated settlement under which the corporation itself is not paying the attorney fees. As we will discuss, *post,* a court approving a negotiated fee in a derivative

suit must determine if the fee is fair and reasonable, but the negotiated fee need not perfectly duplicate the fees that would be awarded under the "substantial benefit doctrine."

*Court's Obligation in Considering a Negotiated Fee*

A court reviewing a settlement agreement considers whether the proposed settlement is fair and reasonable in light of all relevant factors. (*In re Caremark Intern. Inc. Deriv. Lit.* (Del. Ch. 1996) 698 A.2d 959, 966 (*Caremark*); *Polk v. Good* (Del. 1986) 507 A.2d 531, 536.) A court reviews the settlement of a derivative suit as a means of protecting the interests of those who are not directly represented in the settlement negotiations. In class actions, for example, "[a]lthough the court gives regard to what is otherwise a private consensual agreement between the parties, the court must also evaluate the proposed settlement agreement with the purpose of protecting the rights of the absent class members who will be bound by the settlement. [Citation.] The court must therefore scrutinize the proposed settlement agreement to the extent necessary to ' "reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.' [Citations.]" (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 245 [110 Cal.Rptr.2d 145].)[2]

When the settlement includes a negotiated fee, the reviewing court must be cognizant that derivative suit counsel might urge an undesirable settlement as a means of avoiding the risk of recovering no fees, or fees substantially less than those counsel might recover as part of, or because of, the settlement. In addition, the defendants and their attorneys, wishing to contain damages, may be tempted by a settlement placing the major financial burden on the corporation itself. (Cox & Hazen on Corporations (2d ed. 2003) Control and Settlement of a Derivative Suit, § 15.16, p. 986.) A court reviewing a negotiated fee, therefore, should review the circumstances leading up to the settlement to ensure that the process was fair and free from fraud or collusion.

In most cases, an agreement to pay fees will have a direct pecuniary impact on the shareholders, or the corporation, or both, as the negotiated fee

---

[2] The duty of a court reviewing a settlement of a class action provides a useful analogy because the court in such cases seeks to protect the members of the class who, like the corporation and non-named shareholders in a derivative suit, may have no independent representation and little control over the action. California Rules of Court, rule 1859, requires court approval of settlements reached in class actions, and rule 1859(g) of that rule requires the court to "conduct an inquiry into the fairness of the proposed settlement."

can or might reduce the amount of any common fund recovered by the stockholders as a result of the litigation, be paid out of the corporation's assets, or where covered by insurance, result in increased premiums or difficulty in obtaining insurance in the future. The court therefore must consider whether the negotiated fee will result in unwarranted harm to the corporation and the shareholders, such as would be the situation if the cost of the settlement to the corporation far exceeded its value to the corporation and shareholders.

In the present case, there is no claim that plaintiffs settled for too little in order to obtain a generous fee. Objectors, as noted, have no complaint with the substantive terms of the settlement. Objectors do not claim that further litigation would have resulted in a greater benefit to the corporation or its shareholders. They also do not complain that the terms of the settlement were either unduly burdensome to the corporation or unlikely to prevent the problems that led to the *Stull* and related litigation. It is also significant that BofA, through its board of directors, urged the court to approve the settlement. Most of the defendant directors were no longer on the board, and the three that continued to serve were not involved in the decision to settle. There is no suggestion that the current board failed to act in good faith or was motivated by anything other than the business interests of the corporation. All these points suggest that the fee was fairly negotiated, and that the settlement of fees was fair and reasonable.

In addition, the parties represented that they negotiated the fee only after reaching an agreement on the substantive terms of the settlement, further agreeing that the substantive terms would stand even if the court refused to approve the negotiated fee. Such a procedure significantly reduces the possibility that the substantive settlement was in any way tainted by the fee negotiations.[3] In theory, at least, once the parties' rights were fixed, the settlement negotiations would be concerned only with the fees the court was likely to award if the matter was submitted to it, as well as the costs to each side of having the court determine reasonable fees.

Plaintiffs and BofA take the position that there is no reason for judicial review of a negotiated fee where, as here, the fee negotiations took place only after the substantive terms of the settlement were resolved. They assert that in such cases there is no risk that fees will be excessive, as neither the defendants nor the corporation would agree to pay more than their estimate of the fees the court would award in the absence of their agreement.

[3] For this reason, many courts prohibit the parties from negotiating understandings related to the derivative suit counsel's fees at the same time they negotiate the terms for settling the suit. (Cox & Hazen on Corporations, *supra,* Award of Attorneys' Fees and Expenses of Suit, § 15.20, p. 1009, and cases cited.)

We disagree. While the parties in effect made a prima facie showing that the fees were negotiated in good faith, the court was not thereby obligated to ignore the complaints of the objectors and approve the fees without further inquiry. The trial court was not required to accept at face value the parties' assurances that the settlement was in fact fair and reasonable, or that they negotiated the fees only after the substantive terms of the settlement agreement were set. Moreover, courts should not ignore the fact that shareholder derivative suits, like class actions and claims based on alleged unfair business practices, provide a tempting arena for litigation for the sake of generating attorney fees. The costs of defending such suits can be great, and it is not uncommon for defendants and their insurers to choose to settle, rather than to litigate, as a means of containing costs, notwithstanding the conviction that the action is frivolous. A blind acceptance of a negotiated fee, on the assumption that a defendant would not agree to pay more than the legitimate value of the attorney's work, simply ignores the realities of the situation. In such cases, and particularly where legitimately interested persons or entities, with standing, have objected to the fees, the court should carefully review a negotiated fee for fairness, to ensure that it neither represents nor encourages frivolous litigation.

*Fairness of Negotiated Fee*

█ As objectors contend, the benefit of avoiding further litigation is not a benefit supporting an award of fees under the "substantial benefit doctrine." Nonetheless, it can be, and often is, a factor supporting settlement. A defendant contemplating settlement quite properly considers whether the cost of continued litigation will greatly exceed the cost of the settlement. A court reviewing the settlement, therefore, charged with the obligation of determining if the proposed settlement is fair and reasonable in light of *all* relevant factors (*Caremark, supra,* 698 A.2d 959, 966), should consider the avoidance of costs of litigation to be a factor favoring settlement. In other words, although the savings resulting from settlement is not a benefit resulting from the litigation and therefore cannot provide a basis for an award of attorney fees under the "substantial benefit doctrine," those savings can be considered in determining whether or not a negotiated fee is fair and reasonable.

█ Nonetheless, the most important factor for deciding if the negotiated fee is fair, is whether the fees bear a reasonable relationship to the value of the attorneys' work. Attorneys are entitled to fair compensation for the work they have done. They are not entitled to compensation for work they have not done, or for fees lost because an early settlement reduced the number of billable hours. Although the negotiated fee need not be perfectly consistent with the fees the court would award under the "substantial benefit doctrine," it must be in the same range. A negotiated fee that clearly is out of that range is not a fair and reasonable settlement of the attorneys' claim for fees.

■ The court approving a settlement that includes a negotiated fee therefore is required to decide if the fee negotiated by the parties closely approximates the value of the attorneys' work. This requirement may be satisfied in a number of ways, depending on factors such as the nature of the case, the nature of the settlement and court's familiarity with the litigation. The means of making this determination are best left to the trial court, whose decision will be reviewed for abuse of discretion.

■ In the present case, the court calculated what would have been a "reasonable attorney fee" under the "substantial benefit doctrine," approving the settlement only after deciding that the negotiated fee approximated that amount. While this approach was well within the court's discretion, we find that the court used factors unsupported by the record in calculating the amount of fees available under the "substantial benefit doctrine." As its analysis was flawed, it does not support the conclusion that the negotiated fee represented a fair fee award. The matter, therefore, must be remanded to the trial court so that it can again determine if the negotiated fee was fair and reasonable.

*Trial Court's Calculation of Amount of Fees*

■ An appellate court reviews a trial court's award of attorney fees for abuse of discretion. (*Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365]; *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 25 [97 Cal.Rptr.2d 797].) The same standard applies here, where we review the trial court's determination of a "reasonable attorney fee" under the "substantial benefit doctrine," as a basis for its decision to approve a negotiated fee. The trial court's discretion must be based on proper matter. " '[T]he abuse of discretion standard measures whether, given the established evidence, the lower court's action "falls within the permissible range of options set by the legal criteria." [Citation.]' " (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 624 [98 Cal.Rptr.2d 388], citing Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1999) ¶¶ 8.88 to 8.89, p. 8-33.) We do not defer to the trial court's ruling when there is no evidence to support it. In addition, "discretion may not be exercised whimsically, and reversal is required where there is no reasonable basis for the ruling or when the trial court has applied the wrong test to determine if the statutory requirements were satisfied." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 634 [71 Cal.Rptr.2d 632]. "We readily acknowledge the discretion of the trial judge to determine the value of professional services rendered in his or her court. [Citation.] Nevertheless, the exercise of that discretion must be based on a proper utilization of the lodestar adjustment method, both to determine the lodestar figure and to analyze the factors that

might justify application of a multiplier. Whether an award is justified and what amount that award should be are two distinct questions, and the factors relating to each must not be intertwined or merged. [Citation.]" (*Id.* at p. 647.)

As discussed earlier, a court awarding fees under the "substantial benefit doctrine" begins by establishing a "lodestar" amount. In setting the lodestar, the court here awarded plaintiffs' attorneys and paralegal assistants their usual rates, and accepted that all hours billed by them were reasonable. As we will reverse the order, we do not here hold that the lodestar amount was an abuse of discretion. We do, however, note that some billings appear questionable. For example, the attorney heading the litigation billed for 884.74 hours of "factual investigation" at a rate of $565 per hour. The record does not disclose exactly what "factual investigation" entailed, but from the description provided by counsel, it appears that a substantial number of these hours were spent reviewing records—a task that at least arguably could have been done by a paralegal or an associate at a fraction of the cost.

The trial court enhanced the lodestar amount by applying multipliers to various phases of the litigation, citing the complexity and novelty of the litigation, the skill and expertise of counsel, the court's belief that the litigation precluded other employment, the contingent nature of the case and the risk of nonrecovery. (See *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1132 and *Serrano III, supra,* 20 Cal.3d at p. 49.) There was scant evidentiary support for the court's use of multipliers.

In finding the litigation to be complex and novel, the court cited the massive and complex accounting issues involved in the *Stull* litigation, the difficulty plaintiffs faced in attempting to prove that individual defendant board members had actual knowledge of the problems leading to the *Stull* litigation, and the fact that the sale of the corporate trust unit raised issues as to whether the plaintiffs were required to have made a demand to sue on the newly constituted board of directors. These matters were the same as those used by the court in finding that fees were available in the first instance. The court, therefore, erred by intertwining the issue of availability of a fee award with issues relating to the amount of that award. In our view, none of the cited matters support the court's conclusion. The accounting difficulties faced in the *Stull* litigation were addressed there; the question presented in this case is whether the defendants should in some way be liable for the sums paid by BofA in the earlier case. The parties' position was that because the *Stull* case settled without actually determining damages (BofA was required only to return some or all of the funds it had failed to escheat), there never has been a determination of what damages would be, let alone a determination of the individual defendants' liability for damages. While this may be true, if, as

all parties agree, BofA paid no damages, but was required only to return money that did not belong to it, the corporation suffered no pecuniary damage as a result of the *Stull* litigation. The extent of the potential liability of the defendants in this case, therefore, is not a question requiring complicated or difficult calculations.

Plaintiffs' difficulties in proving individual director liability arise from difficulties of proof, not from novelty or complexity of issues. It is undoubtedly true that it would be time-consuming and difficult to garner evidence that any director had the kind of knowledge and intent that would subject that director to liability. However, the legal question of director liability—assuming a sufficient evidentiary basis—is neither novel nor complex. Similarly, whether the plaintiffs were required to make a demand on the new board of directors also presents no novel or complex issue.

There also is little, if any, support for the court's conclusion that the skill and expertise of counsel justified a multiplier. The question is whether the litigation "required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ketchum v. Moses, supra,* 24 Cal.4th at p. 1132.) The firm employed by plaintiffs is a nationally recognized leader and expert in this type of litigation. That plaintiffs' attorneys are known for providing high-quality work, however, is fully reflected by the fees charged, which are at the upper end of the spectrum, and therefore are already the "market rate" for such services. Moreover, the parties' arguments suggest that the vast bulk of the work did not and would not require special skill or expertise. To the contrary, it appears that the majority of the hours billed were spent on sifting through records for evidence to support plaintiffs' theory of liability.

The court found, "It is axiomatic that counsel were precluded from prosecuting other actions during the more than 4300 hours spent in prosecuting this action." Under this reasoning, a multiplier would be appropriate in any lodestar type of case, since it is axiomatic that time spent by individual attorneys on one case prevents them from spending time on another. There is no showing that the firm employed by plaintiffs in fact was forced to turn away other work because of this case.

The contingent nature and risk of the litigation also does not justify a multiplier. The purpose of a fee enhancement for contingent risk is to create financial incentives to encourage attorneys to undertake cases enforcing important rights, by providing compensation for the risk of loss. (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1132–1133.) Balanced against the interest in vindicating important rights, however, is the interest in preventing needless litigation of baseless claims. The record strongly suggests that the contingent

nature and risk involved here resulted from the weakness of plaintiffs' case, as opposed to difficulties of proof or novelty of the legal theories.[4]

Finally, we cannot ignore that there appears to have been very little real benefit conferred on the corporation and shareholders as a result of the litigation. As the fees at issue here were not awarded under the "substantial benefit theory," the lack of significant benefit does not in and of itself preclude approval of the settlement, but it is a factor to be considered in deciding whether the negotiated fee represents a fair settlement of the attorneys' claim. The trial court found the litigation had conferred a substantial benefit on the corporation, but again, the record provides little support for that finding. The litigation at least arguably resulted in the institution of the Compliance Program, and did result in commitments to report on the program and to extend the program to any corporate trust unit developed over the next two years. As objectors have pointed out, however, there was no showing that the program was needed for any unit other than the corporate trust unit, and BofA sold the trust unit several years before this case was instituted. The record suggests that the court based its finding of substantial benefit at least in part on its conclusion that the corporation benefited from the end of litigation. As we have explained, it was perfectly proper for the court to conclude that the *settlement* was reasonable in large part because it avoided any further costs of litigation. It would not be proper, however, for the court to consider the benefit from avoiding further costs of litigation as providing any support for a finding that the *litigation* conferred a benefit on the corporation.

---

[4] The weakness of plaintiffs' case was summarized by BofA in urging the court to approve the substantive terms of the settlement:

"BofA did not believe there to be a reasonable likelihood of receiving a monetary recovery sufficient to justify prosecution of this action in light of the numerous legal and factual difficulties plaintiffs would face in attempting to prove their claims. The derivative plaintiffs' and defendants' submissions discuss in detail the many hurdles that the derivative plaintiffs (and hence BofA) would be required to overcome should the litigation proceed. To give but a few examples of why plaintiffs' claims would be difficult to prove, the focus of plaintiffs' claims—their assertion that the directors of [BankAmerica Corporation] failed adequately to oversee the Bank's corporate trust department, i.e., that the directors breached their duty of due care—is among the most difficult type of fiduciary duty claims on which to prevail. *In re Caremark Int'l, Inc. Derivative Litig.* (Del. Ch. 1996) 698 A.2d 959, 971. Under Delaware law, such claims are at least subject to a gross negligence standard, which is a very high hurdle. *McMullin v. Beran* (Del. 2000) 765 A.2d 910, 921. And here, the possibility of monetary recovery for BofA is minimized even further because of the exculpatory provisions in [BankAmerica Corporation's] certificate of incorporation, which [provides] that [BankAmerica Corporation] directors cannot be liable to the corporation at all for due care violations except in extremely limited circumstances. See *In re Baxter Int'l, Inc. Shareholders Litig.* (Del. Ch. 1995) 654 A.2d 1268, 1270 (providing that exculpatory provisions waive viability for due care violations.)"

In conclusion, we find this record so devoid of evidence supporting a substantial multiplier that the trial court's use of multipliers from 2.5 to 3.0 to enhance the lodestar was an abuse of discretion.

## Conclusion

The order approving the settlement of attorney fees is reversed and the matter remanded to the trial court to decide if the negotiated fee amount was a fair and reasonable settlement of the attorneys' claim for fees. If in making this determination, the court recalculates the fees it would have awarded under the "substantial benefit doctrine," it should analyze that question in a manner consistent with the principles we have discussed.

Marchiano, P. J., and Swager, J., concurred.